| | |
|---|---|
| **In the Matter of the Application of the United States of America for an Order Authorizing Small Unmanned Aircraft System Surveillance of Private Property** | **Memorandum Opinion** |

      The United States seeks permission to conduct remote surveillance of two properties—both of which contain a home—using a small, unmanned aircraft system, a device better known as a drone. Although the application's supporting affidavit contains enough evidence to establish probable cause, the United States asks this court to authorize the search through an All Writs Act order rather than a warrant.

      But the All Writs Act is the wrong tool for the job. The Act enables courts to issue orders to effectuate existing search warrants, but it cannot provide independent authority to search private property—especially when the search seriously implicates Fourth Amendment interests. Thus, the court denies the United States' application.

**I.    Background**

      The United States believes that certain individuals are engaged in a sophisticated operation to import, possess, and distribute illegal drugs. Application at 3–4. The drug distribution operation allegedly has two primary locations, both in Eastern North Carolina. *Id.* at 2. The first, which the United States believes to be a "trap house,"[1] contains a residence that is not clearly visible from the street. Affidavit at 7, 36. It has a dirt driveway, a screened-in porch, a shed, and a barn. *Id.* at

---

[1] The officer whose affidavit was submitted with the United States' application defines a "trap house" as "a location to distribute drugs to customers and conspirators[.]" Affidavit at 7.

13. The residence on the second property, an alleged "stash house,"[2] is closer to the street, but law enforcement agents cannot drive by it without garnering suspicion. *Id.* at 7, 37. It, too, has a screened-in porch. *Id.* at 13.

Law enforcement agents have used a panoply of investigatory tools to try to learn more about the suspects' activities. Among these are: confidential sources and undercover agents; cooperating defendants; traditional physical surveillance (including GPS and phone monitoring); geo-location data; pole cameras; pen registers; and toll records.

While these methods have yielded some information, the United States believes it now needs to use more advanced investigatory methods. *Id.* at 28. It explains that, among other problems, the suspects "engage in counter surveillance techniques" that make traditional methods of investigation less effective. *Id.* at 37. Further, law enforcement believes that executing a search warrant at the two properties would be premature and "could compromise the investigation" altogether. *Id.* at 44.

Enter the drone. The United States contends that, to meaningfully advance its investigation, it needs to record the "visual, non-verbal conduct and activities" near the homes on both properties using a drone. Application at 4. The United States claims that the drone footage will uncover evidence about the nature and scope of the drug ring as well as the identities of its participants and accomplices. *Id.* To gather this information, the United States requests an order authorizing drone surveillance of the properties for 30 days. *Id.* at 5.

The United States' application refers to Rule 41(b) of the Federal Rules of Criminal Procedure as well as the All Writs Act. *Id.* at 1. Both the United States' application and its

---

[2] The officer also explains that a "stash house" is "a location to store drugs and drug proceeds." Affidavit at 7.

2

supporting affidavit repeatedly mention that there is "probable cause" to allow drone surveillance. In almost all respects, the application mirrors that of a warrant. And just last month, a North Carolina Superior Court judge issued a warrant allowing the local Sheriff's Office to use a drone to surveil the curtilage of the alleged trap house.[3] *Id.* at 52. But the United States does not ask this court to follow suit; it explicitly seeks an order—not a warrant—authorizing its surveillance operation.

## II. Discussion

The All Writs Act allows courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). In the context of law enforcement searches, the Act allows courts to effectuate already existent orders or warrants. *See, e.g.*, *United States* v. *N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained[.]"). The Act is routinely invoked to require nonparty companies to disclose stored information related to a valid warrant or to assist in its implementation. *See, e.g.*, *id.* at 176; *United States* v. *X*, 601 F. Supp. 1039, 1042–43 (D. Md. 1984); *United States* v. *Doe*, 537 F. Supp. 838, 840 (E.D.N.Y. 1982). In short, the Act is "a gap-filling measure" that helps courts and law enforcement ensure that their goals are not frustrated. *In re United States ex rel. an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 580 (D. Md. 2011) (hereinafter *In re Order Authorizing Disclosure*).

---

[3] That warrant expired on September 21, 2022.

3

Courts consider four elements when determining whether they may issue an order under the All Writs Act. *Id.* First, they query whether any other federal law governs the request. *Id.* If so, an order under the All Writs Act is inappropriate. *Id.* If no other law is on point, courts then consider whether the proposed authorization raises any constitutional issues. *Id.* at 580–81. Should none arise, courts turn to the third factor: whether the order sought under the Act would supplement an existing order. *Id.* at 581. Finally, if all other elements are satisfied, courts determine whether the government has met its burden of showing that "exceptional circumstances" warrant the use of the Act. *Id.*

A. **Applicable Federal Law**

In reviewing an application for an All Writs Act order, courts must first determine whether it is necessary to rely on the Act's broad grant of authority. When another federal law could get the job done, the Act does not apply. *See, e.g.*, *Pa. Bureau of Corr.* v. *U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985) ("Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling."). Thus, courts most often invoke the Act to supplement existing orders, not to create standalone authority for law enforcement actions. *See id.* at 40; *N.Y. Tel. Co.*, 434 U.S. at 172.

Federal Rule of Criminal Procedure 41 trumps the All Writs Act when the government seeks to conduct a search. *In re Order Authorizing Disclosure*, 849 F. Supp. 2d at 580. That rule allows the court to issue a warrant authorizing the United States' proposed search. Fed. R. Crim. P. 41(d). The All Writs Act allows the court to issue orders that supplement—not replace—a Rule 41 warrant. *See N.Y. Tel. Co.*, 434 U.S. at 172; *Pa. Bureau of Corr.*, 474 U.S. at 43.

But the United States does not seek to use the All Writs Act to supplement an existing warrant by gathering information or forcing compliance from a third party. Instead, it asks the

4

court to invoke the Act to give it something that's seemingly functionally identical to a search warrant. *See* Application at 4. But, if the United States believes that the court's blessing is necessary to conduct its drone surveillance operation, the Act cannot provide that standalone authority—the court may only proceed under Rule 41. *See, e.g.*, *In re Order Authorizing Disclosure*, 849 F. Supp. 2d at 580 ("Rule 41 establishes procedures for all search warrants not excepted by other statutes."). An order under the All Writs Act, then, is improper.

B. **Constitutional Concerns**

Courts next consider whether the proposed order raises any constitutional concerns. *See In re Order Authorizing Disclosure*, 849 F. Supp. 2d at 580–81; *Mt. Valley Pipeline, LLC* v. *4.72 Acres of Land*, 529 F. Supp. 3d 563, 567 (W.D. Va. 2021) (citation omitted); *United States* v. *X*, 601 F. Supp. at 1043 (finding that an order under the All Writs Act was permissible to effectuate an arrest warrant where no Fourth Amendment rights were implicated). Because the United States wishes to surveil private property in search of incriminating evidence, individuals' Fourth Amendment rights could be implicated. And the All Writs Act "does not grant the Court an unbridled inherent power to infringe on an individual's privacy rights, outside of the governing structure of the Fourth Amendment." *In re Order Authorizing Disclosure*, 849 F. Supp. 2d at 579.

The Fourth Amendment protects individuals' right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. In the context of warrantless searches—such as the one at issue here—the Fourth Amendment has spawned two lines of cases. The first line, best captured by *Katz* v. *United States*, 389 U.S. 347 (1967), focuses on "people, not places[.]" *Id.* at 351. Under this doctrine, a warrantless search runs afoul the Fourth Amendment if it violates an individual's "reasonable expectation of privacy." *Id.* at 360 (Harlan, J., concurring).

5

The second line of cases—the roots of which trace to the common law—coexists with *Katz*. *United States* v. *Jones*, 565 U.S. 400, 406–08 (2012). This doctrine grounds Fourth Amendment protections in "a particular concern for government trespass upon the areas [the Amendment] enumerates." *Id.* at 406. And the Supreme Court has stressed that, while *Katz* supplemented the constitutional protections rooted in the common law, it has not replaced them. *Id.* at 409 ("[T]he Katz reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."). The two lines of cases will be discussed in turn.

### 1. Reasonable Expectation of Privacy

Justice Harlan's concurrence in *Katz* laid out the modern "reasonable expectation of privacy" test in Fourth Amendment law. 389 U.S. at 360 (Harlan, J., concurring). At issue in *Katz* was law enforcement's warrantless attachment of an electronic listening device to the outside of a public telephone booth. *Id.* at 348 (majority opinion). The device allowed the authorities to listen in on a defendant's call, where they overheard him relaying gambling information to citizens of other states. *Id.* at 354. Justice Harlan's concurrence, which proved more precedential than the majority opinion, held that the use of the device was unconstitutional. *Id.* at 360 (Harlan, J., concurring).

Harlan found that the warrantless use of the device violated the defendant's reasonable expectation of privacy. *Id.* This expectation has two components: subjective and objective. *Id.* at 361. The former requires that the defendant's actions show that he believed he was engaged in private conduct. *Id.* The latter component is sociological—it requires that the expectation of privacy "be one that society is prepared to recognize as 'reasonable.'" *Id.* In short, because an individual speaking in a telephone booth believes his conversation to be private—and because

6

society at large agrees with him—he has a reasonable expectation of privacy in his conversations. *Id.*

Invoking *Katz*, the Supreme Court has held that certain warrantless aerial surveillance operations are constitutional, even if they observe the area immediately surrounding a home. *California* v. *Ciraolo*, 476 U.S. 207 (1986); *Florida* v. *Riley*, 488 U.S. 445 (1989). In *California* v. *Ciraolo*, the Court found no Fourth Amendment violation when officers, flying in an airplane 1,000 feet above ground, observed marijuana plants growing in a defendant's backyard with their naked eyes. 476 U.S. at 215. The Court determined not only that the defendant's ten-foot privacy fence failed to reflect a subjective belief[4] that the conduct taking place there was private, but also that any such belief would be objectively unreasonable. *Id.* at 212–14. Because anyone could legally fly an airplane in navigable airspace above the defendant's house and observe his marijuana plants, his "expectation that his garden was protected from such observation . . . is not an expectation that society is prepared to honor." *Id.* at 214.

The Court ruled similarly in *Riley*. There, it held that police—hovering in a helicopter 400 feet above private property—did not violate the Fourth Amendment when they spied marijuana plants inside a partially covered greenhouse in a defendant's backyard. *Riley*, 488 U.S. at 450. Because helicopters are not bound by the same minimum-height restrictions as flying airplanes, "[a]ny member of the public could legally have been flying over [the defendant]'s property[.]" *Id.* at 451. And since the police officers did nothing that the public couldn't do, their search didn't require a warrant under *Katz*. *Id.*

---

[4] The Court reasoned that the fence failed to show a clear subjective belief in privacy because it "might not shield [the marijuana] from the eyes of a citizen or a policeman perched on the top of a truck or a two-level bus." *Ciraolo*, 476 U.S. at 211.

7

*Riley* contains one important caveat: The Court cautioned against interpreting the case as holding "that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law." *Id.* at 451. The outcome may differ, the Court noted, if an aircraft violates the law or is rare enough that society would recognize a reasonable privacy interest in being free from its surveillance. *Id.* The Court also left open the possibility that an aerial intrusion that interferes with the use of someone's curtilage or reveals "intimate details connected with the use of the home or curtilage" may conflict with the Fourth Amendment. *Id.* at 452.

The Fourth Circuit has gone even further (or, perhaps, lower) than *Riley* and *Ciraolo*. Invoking those cases, the court held that warrantless helicopter searches at an altitude as low as 100 feet do not violate defendants' reasonable expectation of privacy.[5] *Giancola* v. *W. Va. Dep't of Pub. Safety*, 830 F.2d 547, 551 (4th Cir. 1987). Although the court did not list every factor that went into its decision, it did note a few as particularly important. *Id.* at 550–51. Among these are: "the total number of instances of surveillance, the frequency of surveillance, the length of each surveillance, the altitude of the aircraft, the number of aircraft, the degree of disruption of legitimate activities on the ground, and whether any flight regulations were violated by the surveillance." *Id.* Because the helicopter searches were short and infrequent, and because they caused no notable damage to the defendant's land, they were constitutional. *Id.* at 551.

The Supreme Court further defined the contours of the reasonable expectation of privacy test in *Carpenter* v. *United States*, 138 S. Ct. 2206 (2018). *Carpenter* expanded the coverage of

---

[5] The court ruled similarly when law enforcement spied a defendant growing marijuana from a helicopter 200 feet in the air. *United States* v. *Breza*, 308 F.3d 430 (4th Cir. 2002). It rested its decision on the lower court's finding that the helicopter complied with all applicable regulations and that "such flights were a regular occurrence" where the defendant's farm was located. *Id.* at 434.

8

*Katz* by establishing that "the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." *Id.* at 2211. Because an individual has a "reasonable expectation of privacy in the whole of his physical movements," he can object to the warrantless acquisition of evidence from third parties that he neither possesses nor owns. *Id.* at 2219.

And interpreting *Carpenter*, the Fourth Circuit recently held that law enforcement does not have a plenary power to track individuals' movements through aerial surveillance. *Leaders of a Beautiful Struggle* v. *Balt. Police Dep't*, 2 F. 4th 330, 341 (4th Cir. 2021). In *Beautiful Struggle*, concerned community members asked the court to enjoin the Baltimore Police Department's use of airplanes outfitted with advanced cameras that could track 32 square miles of downtown Baltimore at once. *Id.* at 334. The planes flew 40 hours each week, and their cameras took one photograph every second. *Id.* This system allowed the police to track the comings and goings of individuals and vehicles across roughly 90% of Baltimore on any given day. *Id.* In short, the surveillance program "enable[d] photographic, retrospective location tracking in multi-hour blocks, often over consecutive days, with a month and a half of daytimes for analysts to work with." *Id.* at 342.

The Fourth Circuit held that accessing the database containing these photos constituted a Fourth Amendment search. *Id.* "[B]ecause the . . . program opens 'an intimate window' into a person's associations and activities," the court wrote, "it violates the reasonable expectation of privacy individuals have in the whole of their movements." *Id.* (citation omitted). The court distinguished *Beautiful Struggle* from the Supreme Court's aerial surveillance cases by emphasizing the sheer breadth of BPD's tracking operation. *Id.* at 345. Because the program in *Beautiful Struggle* tracked an entire city—rather than the conduct of individual targets—the court

9

held that the "program's 'aerial' nature is only incidental to" the Fourth Amendment claim at issue. *Id.* Thus, under *Katz* and *Carpenter*, the program contravened the constitution.

### 2. Property Rights

*Katz* and its progeny do not stand alone. The Supreme Court has made clear that a second theory of the Fourth Amendment, rooted in common law principles protecting private property ownership, also provides protection against unreasonable, warrantless searches. *See, e.g.*, *Jones*, 565 U.S. at 406–08.

In *Jones*, the Court considered the warrantless attachment of a GPS tracker to a vehicle driven by an individual suspected of trafficking narcotics.[6] *Id.* at 402–04. When law enforcement officials attached the tracker, the car was in a public parking lot. *Id.* at 403. But law enforcement then used the device to track the car's movements across both public and private property over a four-week period. *Id.* The government leveraged the information gained to obtain an indictment and, eventually, a conviction. *Id.* On appeal, the defendant argued that the admission of evidence gained through the GPS tracker violated his Fourth Amendment rights. *Id.* at 404.

The Court agreed. But it did not base its decision on *Katz*'s reasonable expectation of privacy test. Instead, the Court invoked the Fourth Amendment's original meaning to find that a search had occurred. *Id.* Because "[t]he Government physically occupied private property for the purpose of obtaining information," the Court "ha[d] no doubt that such a physical intrusion would have been considered a 'search'" when the Fourth Amendment was adopted. *Id.* at 404–05. The government, then, needed a warrant. *Id.*

---

[6] Technically the placement of the GPS device violated a valid warrant; it was not warrantless. *Jones*, 565 U.S. at 402–03.

Emphasizing the Fourth Amendment's roots in common law, the court explained that exclusive application of the *Katz* test would insufficiently protect individuals against unreasonable searches conducted through trespass. *Id.* at 412. In fact, some justices have expressed concern that the *Katz* framework, with its emphasis on people rather than places, conflicts with the original public meaning of the Fourth Amendment altogether. *Carpenter*, 138 S. Ct. at 2238 (Thomas, J., dissenting) ("The *Katz* test distorts the original meaning of 'searc[h.]'"); *Minnesota* v. *Carter*, 525 U.S. 83, 97 (1998) (Scalia, J., concurring) ("[The *Katz* test] has no plausible foundation in the text of the Fourth Amendment."). A fairer interpretation of the Amendment would lead a court to protect the objects it lists—persons, houses, papers, and effects. *Carter*, 525 U.S. at 97 (Scalia, J., concurring).

Attempting that fairer interpretation, the Court in *Jones* laid out a simple test for determining whether a Fourth Amendment search has taken place: Did the government trespass into an area protected by the Fourth Amendment with the intent to obtain information? If so, a search has occurred.[7] *Jones*, 565 U.S. at 408 n.5 ("Trespass alone does not qualify, but there must be conjoined with that what was present here: an attempt to find something or to obtain information."); *see also Florida* v. *Jardines*, 569 U.S. 1, 5 (2013) ("When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred.") (citation and internal

---

[7] To be sure, not every intrusion upon private property without express invitation constitutes a trespass. Implied consent, the Court has explained, "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Florida* v. *Jardines*, 569 U.S. 1, 8 (2013). While complying with the intuitive limits of implied consent, officers need not ignore evidence in their plain view. *See, e.g., Ciraolo*, 476 U.S. at 213.

quotation marks omitted). Applying this test in *Jones*, the Court held that a vehicle is an "effect" as understood by the Fourth Amendment, and the trespassory installation of a GPS monitoring device on a vehicle constitutes a search. 565 U.S. at 404. Thus, the installation and monitoring without a valid warrant was unconstitutional. *Id*

Like an individual's car, the curtilage surrounding his home enjoys Fourth Amendment protection. *United States* v. *Dunn*, 480 U.S. 294, 300 (1987). At common law, a home's curtilage was the area of the property immediately surrounding the house. *Id.* at 300. This area is "part of the home itself for Fourth Amendment purposes" and receives all the concomitant protections. *Jardines*, 569 at 6 (quoting *Oliver* v. *United States*, 466 U.S. 170, 180 (1984)). Thus, when law enforcement trespasses into curtilage to obtain information, it violates the Fourth Amendment. *Jones*, 565 U.S. at 408 n.5. But when no physical trespass occurs—such as when law enforcement places a pole camera on a nearby utility post to observe a home's curtilage—courts typically find no constitutional violation. *See, e.g.*, *United States* v. *Houston*, 813 F.3d 282, 285–86 (6th Cir. 2016); *United States* v. *Bucci*, 582 F.3d 108, 116–17 (1st Cir. 2009).

Outside a home's curtilage lie open fields, which the Fourth Amendment does not protect. *Hester* v. *United States*, 265 U.S. 57 (1924). This is because the Fourth Amendment never mentions a person's uninhabited property. *Jardines*, 569 U.S. at 6 (citation omitted). So—unlike with curtilage—law enforcement may enter and place cameras in a property's open fields even though officers had no permission to enter. *Compare, e.g.*, *United States* v. *Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009) (holding that the warrantless placement of a camera to observe illegal hawk hunting in a defendant's open fields did not violate the Fourth Amendment), *with United States* v. *Gregory*, 497 F. Supp. 3d 243, 271 (E.D. Ky. 2020) (holding that an officer's unwarranted

12

physical intrusion into a defendant's curtilage with the intent to record it on his cell phone camera violated the Fourth Amendment).

Courts look at four factors to determine whether a part of someone's property falls within curtilage or open fields. *Dunn*, 480 U.S. at 301. These are "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* The Supreme Court has suggested that curtilage is an intuitive concept—in most cases, the curtilage will be "clearly marked . . . as the area around the home to which the activity of home life extends[.]" *Oliver*, 466 U.S. at 182 n.12.

Although the idea of curtilage is easily grasped, it can be difficult to know where, exactly, a home's curtilage ends. The Court has said that "[t]he front porch is the classic exemplar of" curtilage, *Jardines*, 569 U.S. at 7, but a barn 60 yards away from a house with a fence between them is not. *Dunn*, 480 U.S. at 302. Portions of a driveway may be curtilage, but it depends on how close they are to a home and whether the homeowner has taken any steps to conceal them. *Compare, e.g.*, *Collins* v. *Virginia*, 138 S. Ct. 1663, 1670–71 (2018) (holding that the enclosed portion of a driveway abutting a house was curtilage), *with United States* v. *Beene*, 818 F.3d 157, 162 (5th Cir. 2016) (holding that a driveway was not curtilage because it could be observed from the street and residents took no actions to keep it private), *cited with approval in United States* v. *Lipford*, 845 F. App'x 266 (4th Cir. 2021). Ultimately, the important inquiry is whether "the area in question harbors those intimate activities associated with domestic life and the privacies of the home." *Dunn*, 480 U.S. at 301 n.4. If so, it's protected.

### 3. The United States' Request

At first blush, the use of unmanned drones to surveil property without a warrant occupies a grey area between the two lines of cases discussed above. On the one hand, the Court has long approved of naked-eye aerial surveillance from public airways. On the other, centuries of common law undergirding private property ownership give individuals a possessory interest in the air above their land to some extent. *See, e.g.*, *United States* v. *Causby*, 328 U.S. 256, 264 (1946) ("The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land."). Indeed, at common law, individuals owned their property from the center of the Earth to the heavens. *See, e.g.*, 2 William Blackstone, Commentaries 18 (Lewis ed. 1902). And while modern air travel (and binding precedent) may have rendered this ancient understanding unworkable, the Supreme Court has emphasized that it is not altogether abandoned. *Causby*, 328 U.S. at 267 (finding a Fifth Amendment taking when government aircraft, flying at a height of 83 feet, interfered with the landowner's use and enjoyment of the land).

Thus, at some altitude below navigable airspace, a flying drone looks less like a necessary exception to the common-law rule and more like trespass. Demarcating the exact altitude at which an object hovering above one's property becomes an aerial invasion, however, is a tall task. Without trying to fashion a bright-line rule, the undersigned thinks it sufficient to say that, at some altitude below navigable airspace, flying a drone above someone's property constitutes a trespass.

The United States' application for an order does not specify the altitude at which law enforcement wishes to operate a drone. Nor does it explain whether officers plan to pilot the drone over the curtilage, homes, or open fields of the two properties.[8] And although the application states

---

[8] The supporting affidavit outlines some protocols meant to minimize potential surveillance of protected activity. *See* Affidavit at 52–53. But these protocols do not discuss whether the drone will operate over public or private property. And the affidavit's reassurance that the government will only deploy the drone "when suspected criminal activity is occurring" or "to spot monitor"

14

that law enforcement will not look within the residences at either property, it provides no such assurances about each home's curtilage. The United States wants to know the identity and activities of those entering and leaving the residences to determine who is involved in the alleged drug ring and build a case against them. Application at 4. Thus, it seems probable that law enforcement will fly the drone at a low altitude above private property, with the camera pointed at or near the entrance to these homes, to catalogue those who come and go. At the very least, nothing in the application precludes law enforcement from doing so.

This raises some Fourth Amendment red flags. Simply put, it is questionable whether law enforcement can—consistent with traditional conceptions of property law—intrude upon an individual's curtilage with a low-altitude camera to survey its contents without a warrant. *Cf. United States* v. *Jenkins*, 124 F.3d 768, 774 (6th Cir. 1997) ("Visual inspection from a lawful vantage point, however, is quite different from the physical assault on defendants' backyard that occurred in this case."); *Gregory*, 497 F. Supp. 3d at 271 (holding that an officer may not trespass into a home's curtilage and record it with his cell phone camera). To be sure, not all areas the United States wishes to fly over or surveil on each property will fall within the curtilage. But some—such as the homes' screened-in porches and their front stoops—no doubt will. *See Jardines*, 569 U.S. at 6–7; Affidavit at 13.

The cases from the Supreme Court and Fourth Circuit that focus on manned aerial surveillance—*Ciraolo*, *Riley*, *Giancola*, and *Beautiful Struggle*—place their emphasis elsewhere. Those courts mainly relied on the *Katz* line of cases rather than the common-law understanding of the Fourth Amendment expounded in *Jones*. And even in *Giancola*, when the Fourth Circuit held

---

the two properties is of no comfort—the right to be free from a warrantless, trespassory search does not rise or fall with officers' mere suspicion that illicit activity is occurring.

15

that naked-eye observations from officers in a helicopter 100 feet high did not violate the Fourth Amendment, the court stressed that the surveillance's infrequency and short duration contributed to its constitutionality. 830 F.2d at 551. At issue in that case were two helicopter flyovers that happened over the span of one year. *Id.* at 548–49. One flyover may have lasted as few as ten minutes. *Id.* at 548.

The United States, in contrast, asks the court for permission to conduct periodic aerial surveillance operations over a span of 30 days. Application at 5. It is unclear how many observations would occur in those 30 days—certainly more than two. And although the supporting officer's affidavit suggests that officers will try not to record after criminal activity stops taking place, it makes no mention of the length of its proposed "spot checks" or routine surveillance operations. *See* Affidavit at 52–54.

But the United States' proposed surveillance raises more fundamental concerns: The problem with the United States' application is not that it violates the suspects' reasonable expectation of privacy in entering and leaving these two properties (although it might). Instead, the proposed surveillance could infringe on the interests of the property owner because it involves a trespass coupled with an attempt to gain incriminating information. *See Jones*, 565 U.S. at 408 n.5.

Put another way, whether the suspects have a reasonable expectation of privacy in their activities on the two parcels is irrelevant to the constitutional calculus under the trespass theory. *Jardines*, 569 U.S. at 5 ("[T]hough *Katz* may add to the baseline [of Fourth Amendment protections], it does not subtract anything from the Amendment's protections when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.") (internal quotation marks and citation omitted). The relevant aerial surveillance cases rightly glossed over

the common law trespass analysis because, in those cases, law enforcement viewed criminal activity from a non-trespassory altitude. But an officer operating a drone at a low altitude implicates trespass law in a way that a pilot flying in navigable airspace does not.

All these concerns could be alleviated if the United States obtained a warrant. But by attempting to proceed under the All Writs Act, the United States forces the court to consider the significant constitutional ambiguity surrounding the nascent use of drones in law enforcement. *See generally* Robert Molko, *The Drones Are Coming—Will the Fourth Amendment Stop Their Threat to Our Privacy?*, 78 Brook. L. Rev. 1279 (2013); Andrew B. Talai, Comment, *Drones &* Jones*: The Fourth Amendment & Police Discretion in the Digital Age*, 102 Calif. L. Rev. 729 (2014).

If law enforcement wants to conduct drone surveillance with the freedom to fly at any altitude in and around a home's curtilage—with the express purpose of searching the curtilage for evidence of wrongdoing—it might need a warrant to do so. *See, e.g.*, *Long Lake Twp.* v. *Maxon*, 970 N.W.2d 893, 905 (Mich. Ct. App. 2021) ("[A] governmental entity seeking to conduct drone surveillance must obtain a warrant or satisfy a traditional exception to the warrant requirement."), *vacated on other grounds*, 973 N.W.2d 615 (Mich. 2022). Thus, the constitutionality of the United States' proposed surveillance is uncertain. And this uncertainty counsels against issuing an All Writs Act order.

### C. Prior Orders

The third step in determining the propriety of an All Writs Act order asks courts to identify another order or warrant that the proposed order supplements. *In re Order Authorizing Disclosure*, 849 F. Supp. 2d at 581. The Act serves a gap-filling function; its main purpose is to "prevent the frustration of orders [a court] has previously issued in its exercise of jurisdiction otherwise obtained." *Pa. Bureau of Corr.*, 474 U.S. at 40; *see also Scardelletti* v. *Rinckwitz*, 68 F. App'x

472, 477–80 (4th Cir. 2003) (upholding district court's use of the Act to issue an injunction preventing an aggrieved party from challenging a previous order approving a class action settlement). It is not an independent source of authority to obtain an order where other law applies. *See, e.g.*, *Clinton* v. *Goldsmith*, 526 U.S. 529, 537 (1999) ("The All Writs Act invests a court with a power essentially equitable and, as such, not generally available to provide alternatives to other, adequate remedies at law.").

The United States can point to no earlier court order needing aid.[9] And although local law enforcement had a search warrant from a North Carolina Superior Court Judge, that warrant expired in September. Affidavit at 52. Further, the United States' surveillance operation and the local Sheriff's Office's investigation seem to have little overlap—the United States' application does not suggest that it seeks a federal All Writs Act order to effectuate a now-expired state court search warrant. This, too, counsels against the propriety of such an order.

### D. Exceptional Circumstances

When all other elements needed to issue an All Writs Act order are satisfied, courts finally turn to the fourth: whether there is an exceptional need for the requested order. *In re Order Authorizing Disclosure*, 849 F. Supp. 2d at 581. At this final stage, courts consider whether less intrusive methods would succeed, whether other means had been tried, and the likelihood of success of the proposed means. *See id.* (collecting cases).

The ease of obtaining a valid search warrant undercuts the United States' lengthy discussion of the methods that it has already tried. *See* Affidavit at 28–50. The government has amassed significant evidence establishing probable cause for a warrant. The most natural—and

---

[9] The United States has obtained one order and one warrant during its investigation already. *See* Affidavit at 51–52. Neither, however, targets the two properties at issue. *Id.*

18

least intrusive—way for the United States to conduct the drone surveillance it desires is to obtain a warrant. *See In re Order Authorizing Disclosure*, 849 F. Supp. 2d at 582 ("The All Writs Act will allow the Court to take the necessary steps to effectuate its orders, but only where all other means have been exhausted.").

The United States contends that it has established probable cause to allow drone surveillance. The undersigned agrees—which makes it even more puzzling that the government requested an All Writs Act order rather than a warrant. The two are not the same, and they carry with them different levels of constitutional scrutiny. *See, e.g.*, *United States* v. *Kone*, 591 F. Supp. 2d 593, 610 (S.D.N.Y. 2008) ("[T]he All Writs Act provides no residual authority to issue a warrant, or its equivalent, when a Rule—here Rule 41—provides the applicable law."). The United States has shown that probable cause exists, but it must request a proper warrant through the proper channels if it wants court authorization before its search.

### III. Conclusion

The United States has two options before it: the government may either apply for a search warrant (which this court would readily issue), or it may conduct its planned surveillance warrantless and roll the dice on the admissibility of the evidence it finds. The United States may not, however, alter the application of the All Writs Act to obtain this court's blessing for a constitutionally questionable search when other avenues are available. For the reasons stated above, then, the United States' application for an order authorizing drone surveillance is denied without prejudice to the government seeking a warrant.

Dated: October 26, 2022

_____
Robert T. Numbers, II
United States Magistrate Judge